301 So.2d 872 (1974)
Succession of Edmond L. STEWART.
Nos. 54394, 54424.
Supreme Court of Louisiana.
October 11, 1974.
Rehearings Denied November 6, 1974.
*873 Harry R. Nelson, Nelson & Achee, Ltd., Shreveport, for applicants in #54424.
John T. Campbell, Campbell, Campbell, Marvin & Johnson, Minden, for applicants in #54394.
*874 Thomas A. Harrell, Baton Rouge, Joseph W. Milner, Blanchard, Walker, O'Quin & Roberts, Henry A. Politz, Booth, Lockard, Jack, Pleasant & LeSage, James J. Thornton, Jr., Johnston & Thornton, Robert G. Pugh, Pugh & Nelson, Shreveport, Jack O. Brittain, Brittain & Williams, Natchitoches, for plaintiff-respondent.
MARCUS, Justice.
This case involves a summary proceeding by rule instituted by the Minden Bank & Trust Company, hereinafter referred to as "the Bank," as co-trustee of the Edmond L. Stewart Trust, hereinafter referred to as "the trust," to obtain a judicial interpretation of the trust instrument and instructions concerning the administration thereof, as authorized by R.S. 9:2233. The facts and circumstances and the attending controversy precipitating the Bank's application are hereinafter set forth.
On August 17, 1955, Edmond L. Stewart, a resident of Webster Parish, Louisiana, with the assistance of Dan W. Stewart, Jr., his nephew and attorney, confected his last will and testament. Article nine of the will contains the residual legacy of the bulk of the testator's estate and purports to create a trust in which the Bank and Dan W. Stewart, Jr. are appointed co-trustees. The provisions of the trust as set forth in the aforesaid article are as follows:
"NINTH: All of the remainder of my estate, I give and bequeath unto Minden Bank & Trust Company, Minden, Louisiana, and Dan W. Stewart, Jr., of Minden, Louisiana, in trust, with seizin and without bond, under the following terms and conditions:
"(a) This trust shall extend for the maximum time permitted under the laws of the State of Louisiana.
"(b) Said Trustees shall hold, manage, handle, control, protect and care for the trust estate in accordance with their best judgment, and so far as practicable shall retain the real estate intact, and shall preserve the timber lands by good forestry practices such as selective cutting and reseeding.
"(c) The Trustees shall have the power in their discretion, on such terms and conditions, and for such consideration as they may deem fit, to make any and all contracts involving all or any part of said property, including real rights, and servitudes applying to said real estate, including the right to sell, alienate, or otherwise dispose of said real estate, including the right to execute mineral leases, mineral and royalty sales; to sign division orders, enter unitization or working agreements, and with full power to lease or purchase, alienate, or sell any nature of property whatsoever, whether real, personal, or mixed, without restrictions and without Court approval.
"(d) Said Trustees are further authorized to sue and be sued, to receive and recipt for any and all monies due said trust estate.
"(e) Said Trustees shall have full power to invest and reinvest in unrestricted property at their discretion and to settle and adjust any claims against, or in favor, of this trust.
"(f) The Trustees shall have all powers granted under the Trust Estates Act and the powers enumerated herein are not to be construed as a limitation upon the powers of said Trustees.
"(g) The Trustees shall keep complete and accurate accounts showing the complete status of the Trust Estate at all times.
"(h) The Trustees shall use any part of the income of said Trust, if necessary, for the health, comfort and well being of my wife, Mrs. Jim Brown Stewart, during her life time.
"(i) The Trustees shall be authorized to make charitable bequests out of said income in their discretion.

*875 "(j) I have many nieces and nephews, both of the whole and the half blood, as well as their descendants, and said Trustees, at their discretion, shall be authorized to make loans or donations to them.
"(k) The Trustees shall have the power to accumulate the income until DAN W. STEWART, III, the beneficiary, is of the age of 65 years, at which time this trust shall terminate, taking into account all their powers to deplete the principal by making loans and donations as previously specified, it being my intention that the bulk of my estate be distributed among my relatives before the termination of this trust.
"(l) This Trust shall be known as the `EDMOND L. STEWART TRUST', and my intention in creating it is to provide for my family, subject to the discretion of said Trustees, as I am confident the Trustees can increase said estate."
On January 11, 1956, Edmond L. Stewart, hereinafter referred to as "the settlor," died leaving no ascendants or descendants. He was survived by his wife, Mrs. Jim Brown Stewart, a number of nieces and nephews and the descendants of predeceased nieces and nephews, hereinafter referred to as "nieces and nephews."
His widow, Mrs. Jim Brown Stewart, and his executor, Dan W. Stewart, Jr., presented his will for probate to the Twenty-Sixth Judicial District Court. In due course, a judgment of possession was rendered on June 14, 1956, sending the Bank and Dan W. Stewart, Jr. into possession, as trustees, of the remainder of the settlor's estate after payment of debts and special legacies. Since the date of the judgment of possession, a period of seventeen years, the Bank and Dan W. Stewart, Jr. have served as trustees of the trust and neither has ever claimed to be a beneficiary under the will during that period.
In December of 1967, and April of 1968, the Bank Trust Committee (of which Dan W. Stewart, Jr. was a member) conducted meetings in which it was decided that a partial distribution of the trust estate should be made to the nieces and nephews of the settlor. Dan W. Stewart, Jr. consented to this proposal and approved the minutes of the meeting authorizing same. In July of 1968, after all parties were located (except one), a total distribution of $50,000.00 was made by means of check signed by Dan W. Stewart, Jr.
Shortly after the distribution had been accomplished, Dan W. Stewart III informed the Bank (apparently for the first time insofar as it appears from the record) that he thought he was the sole beneficiary of the trust, that he was entitled to receive the entire trust estate, and that the $50,000.00 disbursement was improper. He then unsuccessfully attempted to force the Bank to resign as co-trustee. Subsequently, he told various officers of the Bank that he considered the trust to be invalid.
As a result of this attack, the Bank filed a rule seeking judicial interpretation of the trust and confirmation of the manner in which the Bank and Dan W. Stewart, Jr., as co-trustees, had previously administered it, as well as a declaration that the nieces and nephews of the settlor were the beneficiaries of the trust. The settlor's nieces and nephews, as well as Dan W. Stewart, Jr., the co-trustee, and his son, Dan W. Stewart III, were duly cited as parties to this proceeding. Miss Dell Brown, the surviving legatee of her sister, Mrs. Jim Brown Stewart, widow of Edmond L. Stewart, who would have inherited the community property of Edmond L. Stewart in the absence of a will, was also joined as a party.
The settlor's nieces and nephews (excluding Dan W. Stewart, Jr.) filed answers adopting the interpretation of the Bank as to the intended beneficiaries under the trust. Dan W. Stewart, Jr., the cotrustee, filed an answer denying the Bank's interpretation of the trust and asserting that his son, Dan W. Stewart III, was the *876 sole beneficiary under the trust and, by reconventional demand, asserted that the trust was invalid. Dan W. Stewart III filed an answer alleging that he was the sole beneficiary of the trust and, as plaintiff in reconvention, asserted that he had acquired from Miss Dell Brown by act dated December 4, 1969, as amended by instrument dated April 27, 1970, all her rights, titles, claims and interests in the estate of Edmond L. Stewart if the will be annulled. By amended answer, he alleged that the trust was null and void because it contained a prohibited substitution and/or fidei commissum; it suspended until a future date the vesting of title; it purported to vest in the trustees the power to appoint persons in whom the trust estate would ultimately vest; and the trust instrument was so uncertain and vague as to the manner in which the trust property would ultimately vest as to make its provisions void.
Miss Dell Brown initially filed a motion in proper person to be dismissed from the proceeding because she had conveyed any interest that she might have had in the subject matter to Dan W. Stewart III. However, on the morning of trial, she filed an answer withdrawing her prior motion and asserting that the will was null and void, claiming that she had succeeded to the interest of the widow of Edmond L. Stewart and was thus entitled to the trust estate. Furthermore, assuming the role of plaintiff in reconvention against Dan W. Stewart III, she collaterally attacked the validity of the conveyances she had executed in his favor and prayed that they be set aside on the grounds that they had been signed under errors of law and fact and were made without consideration.
The Bank and the nieces and nephews of Edmond L. Stewart filed responses denying the invalidity of the trust and asserting that, because of the fiduciary relationship existing between the settlor, the trust and the Bank, on the one hand, and the firm of Stewart & Stewart, a law partnership composed of Dan W. Stewart, Jr. and Dan W. Stewart III, the latter are estopped from questioning the validity of the trust. In addition, these parties filed pleas of prescription and exceptions of no cause of action.
After trial, the district court held that:
(1) The trust created by the will of Edmond L. Stewart was valid;
(2) The trust shall continue until Dan W. Stewart III reaches age 65, at which time the trust shall terminate;
(3) The sole beneficiaries of the trust are the nieces and nephews of Edmond L. Stewart who survived him and the descendants of those nieces and nephews who predeceased him, and further, that the property comprising the trust is vested by roots or stirpes in as many shares as there were nieces and nephews of Edmond L. Stewart, with one share going to each surviving niece or nephew and one share to the descending line of each predeceased niece and nephew, except for the share of Dan W. Stewart, Jr., a co-trustee of the trust, which is vested in the latter's children; and
(4) The Minden Bank & Trust Company and Dan W. Stewart, Jr., co-trustees of the trust, shall distribute to the trust beneficiaries from time to time, in such manner as may be deemed prudent by the co-trustees, the income and principal comprising the trust so that by the trust's termination date the bulk of the assets thereof shall have been distributed.
From this judgment, Dan W. Stewart, Jr., Dan W. Stewart III, and Miss Dell Brown appealed. The Court of Appeal amended the judgment of the trial court to include Dan W. Stewart, Jr. as one of the beneficiaries under the trust in lieu of Dan W. Stewart III and as thus amended, the judgment was affirmed in all other respects.
Dan W. Stewart, Jr., Dan W. Stewart III and the executor of the estate of Miss Dell Brown (she having died during the course of this proceeding) applied to this *877 Court for a writ of review. We granted same to consider the highly complex issues presented.
The pivotal issue involves the proper interpretation or construction to be given the provisions of the trust instrument. Only until these provisions are afforded their proper construction can this Court determine the respective rights of the various parties thereunder.
In the interpretation of testaments, Article 1712 of the Civil Code obliges us to ascertain the intent of the testator as our principal endeavor. That article provides:
"In the interpretation of acts of last will, the intention of the testator must principally be endeavored to be ascertained, without departing, however, from the proper signification of the terms of the testament."
Adhering to this maxim, we stated in Succession of McBurney, 165 La. 357, 115 So. 618 (1928), that the first and cardinal rule among the general rules for the interpretation of wills is that the intention of the testator must be ascertained.
Defendants in rule contend that the provisions of the trust instrument are clear and unambiguous and that the Court of Appeal erred in concluding otherwise and thereupon taking into consideration extrinsic evidence. It is apparent that the trust contains language which seemingly is inconsistent with other language contained therein. For example, clause (a) provides that the trust is to continue for the maximum time permitted under the laws of Louisiana; however, clause (k) states that the trust will terminate when the beneficiary, Dan W. Stewart III, reaches age 65. In addition, clause (b) states that the trustees shall, so far as practicable, retain the real estate intact, yet clause (k) states that it is the settlor's intention that the bulk of the estate be distributed among his relatives before the termination of the trust. Furthermore, the only instance in which the settlor employs the word "beneficiary" is found in clause (k) which provides that the trustees shall have the power to accumulate income until the beneficiary, Dan W. Stewart III, is of the age of 65, at which time, the trust will terminate; but, in other places, especially clauses (j), (k) and (l), the language indicates that all the settlor's nieces and nephews are the beneficiaries of the trust. Thus, given these inconsistencies between different provisions of the trust instrument, the true intent of the settlor with respect to those provisions is not readily apparent from the terms of the instrument itself. In such situations, Article 1715 of the Civil Code obliges us to consider all circumstances which may aid in the discovery of the testator's intent. That article provides:
"When, from the terms made use of by the testator, his intention can not be ascertained, recourse must be had to all circumstances which may aid in the discovery of his intention."
In Giroir v. Dumesnil, 248 La. 1037, 184 So.2d 1 (1966) we stated:
"When a will is ambiguous, the court uses extrinsic evidence to determine what the words of the testator as written actually mean. The evidence is used to resolve ambiguity, not to rewrite the will or do violence to its terms. The court seeks to lay bare the intention of the testator. LSA-C.C. Arts. 1712, 1715."
See Succession of Smart, 214 La. 63, 36 So.2d 639 (1948) and Succession of Montegut, 211 La. 112, 29 So.2d 583 (1947).
Several witnesses were called during the trial on the merits and much testimony was adduced. One of the settlor's nieces and four of his nephews testified generally and without contradiction that the settlor was the family patriarch and maintained a close relationship with all the members of his family. He corresponded with them and hosted family reunions annually from 1930 until shortly before his death. In addition, he stood by to aid any member of the family financially should such need arise.
*878 Dan W. Stewart, Jr., the settlor's nephew and co-trustee, testified that he had drafted the settlor's testament containing the trust provisions. The drafting was accomplished in accordance with the settlor's instructions. He stated that it was the settlor's intention to create a trust which would provide for his family. He further testified that the $50,000.00 disbursement to the nieces and nephews, the parties in whom the property was vested upon the settlor's death, was made in accordance with the laws governing intestacy and in proportion to their respective interests in the trust. He affirmed that the said distribution was consistent with the intention of the settlor as expressed in clause (k) of the trust. Dan W. Stewart, Jr. also stated that it was the settlor's intention that gifts and loans to the nieces and nephews were to be made against their respective interests in the trust and that the trust estate would be distributed before the termination thereof.
Dr. W. M. Allums, one of the settlor's grand-nephews and a witness to the will, testified that the settlor told him at the signing of the will that the purpose of the will was to take care of his nieces and nephews. He also testified that Dan W. Stewart, Jr. told him that the purpose of the trust was to provide for the members of the settlor's family, specifically, the settlor's nieces and nephews, and that the trust would last until Dan W. Stewart III became 65, by which time the trust estate would have been distributed among the settlor's nieces and nephews.
Considering the language of the trust read in its entirety and the extrinsic evidence, we conclude that the clear intention of the settlor was to create a trust for the benefit of the members of his family. Specifically, the settlor intended that his nieces and nephews would be the income and principal beneficiaries of the trust. This construction is not only in keeping with the language of the trust and the extrinsic evidence, but also adheres to the principles set forth in the Trust Estates Law as such law existed at the time this trust took effect. See R.S. 9:1815; R.S. 9:1792(2), (5), (10) and (14), as amended by Act 197 of 1950. It is also clear that the settlor intended that the trust property was to be transferred to the trustees in trust only, for the benefit of these beneficiaries. See R.S. 9:1811, as amended by Act 209 of 1952. Also, the trust was to take effect upon the death of the settlor. See R.S. 9:1812. Further, since there is no expression to the contrary, the beneficiaries' interests vested by roots and stirpes in as many shares as there were nieces and nephews of the settlor with one share going to each surviving niece or nephew and one share to each line of each predeceased niece or nephew. See R.S. 9:1792(10), as amended by Act 197 of 1950.
Concerning the status of Dan W. Stewart, Jr. under the trust, the record discloses that he was the attorney who drafted the settlor's will. We can assume that he was apprised of the law in effect at the time he drafted the settlor's will, i.e., August 17, 1955. At that time, as well as when the trust took effect, R.S. 9:1874, as amended by Act 232 of 1950, provided:
"A beneficiary of a trust shall not be the sole trustee or one of two trustees of a trust; but beneficiaries may be trustees so long as they are outnumbered by trustees who are not beneficiaries." (Emphasis added)
Since Dan W. Stewart, Jr. was named one of two trustees, the other being the Bank, R.S. 9:1874 expressly prohibited him from being a beneficiary of the trust. Since he was the settlor's attorney and drafter of the will, we can fairly assume that he advised the settlor that he could not serve in the dual capacity of trustee and beneficiary under the law at that time. Furthermore, the designation of Dan W. Stewart III as a beneficiary in the trust instrument is evidence that the settlor was aware of this fact and intended Dan W. *879 Stewart III to be a beneficiary in lieu of his father.
The Court of Appeal reasoned that the disqualification provided by R.S. 9:1874 extended only to the position of co-trustee rather than beneficiary. Thus, that court concluded that Dan W. Stewart, Jr., being a nephew of the settlor, was not disqualified as a beneficiary, but rather, as co-trustee. Furthermore, that court stated that the children of Dan W. Stewart, Jr. namely Dan W. Stewart III, could not be beneficiaries under the trust because Dan W. Stewart, Jr. survived the settlor, and the settlor named as beneficiaries only his nieces and nephews who survived him and only the descendants of those nieces and nephews who had predeceased him.
We do not agree with the interpretation of the Court of Appeal in this regard, for it does not implement the settlor's intent manifested by the fair import of the words employed by him in the trust instrument. The settlor therein specifically designated Dan W. Stewart III as a beneficiary and appointed Dan W. Stewart, Jr. as co-trustee, thereby indicating that he intended that Dan W. Stewart, Jr. was to serve as co-trustee and that whatever interest he would have had if he had not been named co-trustee would vest in his son, Dan W. Stewart III, as a beneficiary.
Defendants in rule urge that the settlor created multiple trusts in his testament because they allege that, under the law applicable on the date of his death, the trust has multiple termination dates, one occurring on the death of each beneficiary. Defendants in rule base this contention on R. S. 9:1794(2), as amended by Act 209 of 1952, which provided in part:

"Unless an earlier termination is required by the trust instrument or by the proper court, every inter vivos or testamentary trust created under this Chapter, other than such as may be established by employers for the benefit of their employees, shall terminate:
* * * * * *
"(2) At the expiration of ten (10) years from the settlor's death as to a beneficiary who is a natural person or until the death of the beneficiary, whichever is the longer period;

"If the terms of the trust purport to require a period of duration as to any beneficiary longer than the maximum allowable period set forth above, but the trust is otherwise valid under this Chapter, the trust shall be enforced as to such beneficiary for the maximum allowable period, and shall then be terminated." (Emphasis added)
The interpretation of this provision was unclear. However, Act 74 of 1962 amended R.S. 9:1794 to clarify the law on the subject of the "maximum allowable period."[1] The pertinent part of R.S. 9:1794, as amended by Act 74 of 1962, provided:
"A. Unless an earlier termination is required by the trust instrument or by the proper court, every inter vivos or testamentary trust created under this Chapter, other than a trust established by an *880 employer for the benefit of his employees, shall terminate:
* * * * * *
"(2) At the death of the last surviving income beneficiary who is a natural person, if there is one income beneficiary or two or more income beneficiaries any one of whom is a natural person; but if every income beneficiary who is a natural person dies within ten years from the settlor's death, the trust shall continue until the end of the ten year period.
* * * * * *
"C. If the terms of the trust purport to require a period of duration longer than the maximum allowable period set forth above, but the trust is otherwise valid under this Chapter, the trust shall be enforced for the maximum allowable period, and shall then be terminated." (Emphasis added)
It is our view that the proper interpretation of R.S. 9:1794(2), as amended by Act 209 of 1952, in light of subsequent legislative clarification thereof and, since no precedent to the contrary can be found, is that the maximum term that the settlor could have fixed in the instant trust, which took effect in 1956, would be based upon the life of the last surviving income beneficiary. Clause (k) of the trust instrument specifically provides that the trust shall terminate when Dan W. Stewart III reaches age 65. Perceiving that this stated term might be too long under the unclear language of R.S. 9:1794(2), as amended by Act 209 of 1952, the settlor added by clause (a) that the trust shall extend for the maximum time permitted under the laws of the State of Louisiana.
Whether the specific term stated in the trust instrument is valid or is longer than the maximum allowable depends upon future contingencies since Dan W. Stewart III still lives and has not yet reached age 65. However, the language of the trust is specific enough to dictate the term thereof in accordance with future events. Giving clause (k) its proper effect, if Dan W. Stewart III (an income as well as principal beneficiary) reaches the age of 65, the trust shall terminate on his 65th birthday. However, giving clauses (a) and (k) their proper conjunctive effect, should Dan W. Stewart III die before reaching age 65, the trust shall continue until the day upon which he would have attained the age of 65 had he lived, if and only if there is another income beneficiary living on that date. On the other hand, if Dan W. Stewart III dies before attaining age 65 and he is not survived by any other income beneficiaries, the trust terminates on his death. Finally, if Dan W. Stewart III dies before attaining the age of 65 and is survived by other income beneficiaries, all of whom also die before the day upon which Dan W. Stewart III would have attained age 65 had he lived, the trust shall terminate on the date of death of the last surviving income beneficiary.
Hence, the contention of defendants in rule in this regard is without merit. One trust has been created by the settlor and it has only one term, depending upon the future contingencies set forth above.
We agree with the findings of the lower courts that, since the settlor's widow died shortly after the trust became effective, any issue which might have been raised because of the contingent bequest to the settlor's widow has become moot because of her death. We further agree that the provision for charitable bequests contained in clause (i) of the trust is merely precatory. Thus, clause (i) should be considered as not written and has no binding effect on either the trustees or the beneficiaries.
Defendants in rule contend that the settlor's entire will is null since the trust provisions contain a prohibited substitution and/or fidei commissum.
To resolve this issue, we must examine the applicable law in effect at the time of the settlor's death.
*881 Article 1520 of the Civil Code[2] then provided:
"Substitutions and fidei commissa are and remain prohibited.
"Every disposition by which the donee, the heir, or legatee is charged to preserve for or to return a thing to a third person is null, even with regard to the donee, the instituted heir or the legatee.
"In consequence of this article the trebellianic portion of the civil law, that is to say, the portion of the property of the testator, which the instituted heir had a right to detain, when he was charged with a fidei commissa or fiduciary bequest is no longer a part of our law."
Also, Article IV, Section 16 of the Louisiana Constitution[3] at that time provided in pertinent part:
"* * * No law shall be passed abolishing forced heirship * * *. No law shall be passed authorizing the creation of substitutions, fidei commissas or trust estates; that the legislature may authorize the creation of trust estates for a period not exceeding ten years from the settlor's death as to a beneficiary which is not a natural person; ten years from the settlor's death as to a beneficiary who is a natural person or until the death of the beneficiary whichever is the longer period; * * *"
In Succession of Reilly, 136 La. 347, 67 So. 27 (1914), the Court fully and completely defined prohibited substitutions and fidei commissa and distinguished between the two. Therein, it was stated:
"In more than a century of jurisprudence on the subject of substitutions and fidei commissa, prohibited by article 1520 of the Civil Code, the distinction between them and the difference in their effect has been consistently observed. The essential elements of the prohibited substitution are that the immediate donee is obliged to keep the title of the legacy inalienable during his lifetime, to be transmitted at his death to a third person designated by the original donor or testator. Such a disposition is null even with regard to the original donee or legatee. In the fidei commissum, whereby the donee or legatee is invested with the title and charged or directed to convey it to another person or to make a particular disposition of it, only the charge or direction, as to the ultimate disposition of the donation or legacy, is null and is to be considered not written, leaving the donation or bequest valid as to the donee or legatee. A substitution is an attempt on the part of the donor or testator to make a testament for his donee or legatee along with his own will, and to substitute his own will for the legal order of succession from his donee or legatee. If permitted, the effect of a substitution would be to tie up the title and keep it out of commerce during the lifetime of the first donee, during which time neither he nor the person designated to receive the title at the donee's death could alienate it. A substitution is necessarily a fidei commissum, but a fidei commissum is not necessarily a substitution. In the fidei commissum the title is not tied up or kept out of commerce; the direction or charge, as to its disposition, is to be regarded only as a precatory suggestion addressed to the conscience of the donee or legatee, which, being illegal, but harmless, can have no binding effect, and may be legally regarded as not written."
This language has been frequently quoted with approval in subsequent cases involving substitutions and fidei commissa. *882 In the later case of Succession of Simms[4] dealing with this subject, this Court again quoted with approval from the Reilly decision. However, this Court made one change in the Reilly definition of prohibited substitutions:
"It is obvious, therefore, that a prohibited substitution exists when a testator places the title of the property bequeathed in a first named legatee (referred to as the instituted heir) at his death, and directs that, at the end of a specified period, usually but not necessarily at the death of the instituted legatee, this title is to be turned over, transmitted, or passed to a second legatee (referred to as the substitute heir), with the result that both parties take their title directly from the testator, the title of the institute being one that he cannot alienate because of the charge that he is to transmit it to the substitute at some time in the future and the title of the substitute being one that the substitute cannot alienate because it does not exist until some date in the future when the property is to eventually `vest' in him." (Emphasis added)
Therefore, the Simms decision perpetuated the Reilly definition of a prohibited substitution with one modification. To be a prohibited substitution, given the other elements set forth in Reilly, the second transmission to the second legatee directed in the original donor's will need not occur upon the death of the first legatee; it need occur only at the end of a specified period subsequent to the first transmission to the first legatee.
In Crichton v. Gredler, 256 La. 156, 235 So.2d 411 (1970),[5] we again quoted with approval the Reilly definition of a prohibited substitution and restated the Simms modified version thereof. Applying these definitions to the trust under attack there, we concluded that the trust contained a prohibited substitution for the following reasons:
"Therefore, inasmuch as a substitution consists of successive principal interests, and of the making of a will for the first named legatee by the decedent, the present will provides for the successive interests to vest after the termination of the trust. The substitution is therefore not `in trust' as the Trust Code could permit. It is, instead, out of trust. Moreover, in so providing the testatrix makes the will of the first legatees. In so doing she creates a substitution prohibited by law."
Finding that the testatrix' will contained a prohibited substitution, we declared the entire will null.
In Succession of Walters, 261 La. 59, 259 So.2d 12 (1972), this Court was not faced with the issue as to whether the will there under attack contained a prohibited substitution, for that decision had already been made in the affirmative by the courts below and was not contested before this Court. The only issue presented was the effect of a prohibited substitution on the remaining valid dispositions contained in the will. We stated that the language "... in cases of prohibited substitutions the whole will is stricken with nullity whereas in cases of fidei commissa, it is only those dispositions which are tainted with that designation that are invalid" originated in Succession of Johnson, 223 La. 1058, 67 So.2d 591 (1953) and was quoted in Succession of Simms and Creighton v. Gredler. We held in Walters that this was a misstatement of the law since the long line of jurisprudence was *883 "to the effect that the nullity of a bequest, as containing a prohibited substitution, does not affect the enforceability of the other valid provisions of the will, which are regular as to form."
Applying the law as it existed at the time the present testament went into effect and the prior jurisprudence to the facts of this case, we conclude that the testament herein does not contain a prohibited substitution. The bequest to the trustees was not made to them as owners or as beneficiaries but rather "in trust" subject to the terms and conditions as therein set forth. The trustees were charged only with the administration of the property for the benefit of the beneficiaries pending its distribution to them. As previously noted, the settlor clearly and unmistakably bequeathed the property placed in trust to his nieces and nephews and their descendants. The trust was created with the immediate vesting of interest in the beneficiaries at the moment of the settlor's death. There is no double or successive vesting of interest here. The trust authorizes the trustees to distribute the property to the beneficiaries some time prior to the date on which Dan W. Stewart III attains the age of 65, and states that it is his intention that the bulk of the estate be distributed among his relatives before the trust is terminated. There is no obligation to preserve the trust property for a second beneficiary or to keep the title inalienable.
Likewise, we conclude that the testament does not include a fidei commissum since no charge is made upon the legatees (income and principal beneficiaries) to make a particular disposition of their respective interests. It is true that the testator directs certain charges to the trustees; however, they are not nor ever will be legatees under the will.
Defendants in rule further contend that the trust violates Article 1573 of the Civil Code in that it authorizes the trustees to choose who the beneficiaries are and what interest such beneficiaries are to have in the trust, as well as the amount of the distributions and when they will be made. They predicate this contention primarily on clauses (j) and (k) of the trust provisions.
Article 1573 of the Civil Code provides:
"The custom of willing by testament, by the intervention of a commissary or attorney in fact is abolished.
"Thus the institution of heir and all other testamentary dispositions committed to the choice of a third person are null, even should that choice have been limited to a certain number of persons designated by the testator."
As stated above, the language of the trust provisions taken together with the extrinsic evidence indicates that the settlor intended that the beneficiaries of the trust were to be those nieces and nephews who survived him and the descendants of those nieces and nephews who predeceased him, his wife (now deceased) and his grandnephew, Dan W. Stewart III. Also, as previously stated, the language of the trust instrument indicates that the settlor intended that the beneficiaries' respective interests in the trust estate would vest in them at the moment of the settlor's death. Therefore, we conclude that the loans or donations authorized by clause (j) and the distribution(s) referred to in clause (k) are to be made by the trustees as against the receiving beneficiaries' respective vested interests in the trust estate. Thus, the trustees are not authorized by clauses (j) and (k) to select who the beneficiaries are to be nor how much such beneficiaries will ultimately receive. The discretion authorized by these clauses pertains only to the choice of the amount and time at which the loans, donations and distributions of the estate will be made, within the confines of the trust's term. We find this to be a purely administrative matter since it does not affect any of the substantive or vested rights of the beneficiaries in the trust estate.
*884 Nevertheless, it is argued that, since such authorization commits "to the choice of a third person" (the trustees) the decision as to how much and when the loans, donations or partial distributions are to be made to the beneficiaries as against their vested interests in the trust, such dispositions violate Article 1573.
Assuming, but not deciding, that such a limited choice as we have here violates Article 1573, we find that such a violation does not render the dispositions null. While we do not find any authorization in the Trust Estates Law, as it existed on the date this trust became effective, permitting such a grant of power to the trustees, the Louisiana Trust Code of 1964, as amended, provides that trusts created prior to the Code shall be governed in all administrative and procedural matters by the provisions of the new Code and its amendments rather than by the laws in effect at the time of creation of such trusts.
R.S. 9:2252, as amended by Act 137 of 1968, provides:
"Trusts heretofore created and any provisions or dispositions therein made shall be governed by the laws in effect at the time of their creation. Unless otherwise provided in the trust instrument, trusts created prior to the effective date of this Code shall be governed in all administrative and procedural matters by the provisions of this Code and not by laws in effect at the time of creation of such trusts, and trusts created prior to the adoption of any amendment to this Code shall be governed in administrative and procedural matters by the provisions of the amendment." (Emphasis added)
Also significant is R.S. 9:1724, which provides:
"The provisions of this Code shall be accorded a liberal construction in favor of freedom of disposition. Whenever this Code is silent, resort shall be had to the Civil Code or other laws, but neither the Civil Code nor any other law shall be invoked to defeat a disposition sanctioned expressly or impliedly by this Code." (Emphasis added)
Therefore, since the dispositions with which we are concerned involve a purely administrative matter, if the present Louisiana Trust Code, as amended, authorizes such dispositions, those dispositions are valid notwithstanding that they took effect prior to the adoption of the new trust code and its amendments, and notwithstanding that they violate a prohibition provided by the Civil Code.
In this connection, under Part V of the Trust Code entitled "Duties and Powers of the Trustee," R.S. 9:2068, as amended, provides:
"A. Except as provided in R.S. 9:1841 through 9:1847, treating the legitime in trust, the trust instrument may direct or permit a trustee to pay accumulated income or principal from the trust property to an income beneficiary for support, maintenance, education, medical expenses, or welfare under objective standards set forth in the trust instrument, even though the payment impairs the interest of another beneficiary. The trust instrument may provide the manner in which and the share of the trust to which the payment shall be charged; if it does not, all payments of accumulated income or principal made for the benefit of an income beneficiary shall be charged against such beneficiary's share in the trust as principal beneficiary, or, if there is no such share, proportionately against the shares of all remaining principal beneficiaries. Unitrusts and annuity trusts, as defined in the United States Internal Revenue Code, contain objective standards that satisfy this section.
"B. If the same person is beneficiary of both income and principal, invasion of the accumulated income or principal held for that beneficiary may be authorized by the trust instrument and full discretion to invade may be conferred on the *885 trustee, without the necessity for prescribing objective standards." (Emphasis added)
Therefore, since all beneficiaries concerned are beneficiaries of both income and principal, R.S. 9:2068, as amended, authorizes clauses (j) and (k) of the trust and does not require that "objective standards" be stated therein. Since the discretion of the trustees authorized by these clauses concerns purely administrative matters, R.S. 9:2252, as amended, directs the application of R.S. 9:2068, as amended. Hence, the dispositions contained in clauses (j) and (k) of the trust are valid, notwithstanding that such grant of authority to the trustees might violate Article 1573 of the Civil Code.
Finding the present testament to contain neither a prohibited substitution nor a fidei commissum, and for the other reasons stated above, the testament of Edmond L. Stewart is valid and the contentions of defendants in rule are without merit.
Since we hold the testament valid, including the trust provisions contained therein, it is not necessary to discuss the remaining issues pertaining to the right of certain of the parties to contest the validity of the will or their estoppel to assert its invalidity. Likewise, it is not necessary to treat any of the other issues presented by the pleadings or developed during trial, such as pleas of prescription and the validity of the purported transfers from Miss Dell Brown to Dan W. Stewart III.
For the reasons assigned, the judgment of the Court of Appeal is amended to include Dan W. Stewart III as one of the beneficiaries designated in the will in lieu of his father, Dan W. Stewart, Jr., and as thus amended, the judgment is affirmed.
TATE, J., concurs in the result and assigns reasons.
BARHAM and DIXON, JJ., dissent.
TATE, Justice (concurring).
The decision reaches an equitable result, and one more in accord with the decedent's intention than to declare the trust invalid. I can subscribe to the decree, therefore, but I do so recognizing the intellectual difficulties which my dissenting brethren find in our resolution of this complex issue.
My primary intellectual difficulty is that, with regard to the provisions in controversy, I do not really find the trust instrument ambiguous. On the face of the instrument, the seeming intention of the testator was to allow his trustees to make loans or donations to his nieces and nephews, in their discretionthey could give more to some, none to some, or in whatever proportion they needed, Clause j, with the only possible equality being required at the time of the termination of the trust, Clause k. The unlimited discretion of the trustees seems to be corroborated by Clause i, which permits the trustees to make charitable bequests at and in their discretion, and by Clause h, which authorizes the trustees to make disbursement to the decedent's surviving widow within their unlimited discretion.
Nevertheless, since the majority of this court, and every other judge of the lower courts who have passed upon it, have concluded that the instrument is ambiguous, thus permitting extrinsic evidence to prove an intent to distribute the principal and income in certain proportions among the nieces and nephews and their descendants, I can yield to such determination of my brethren. I can do so, especially since in fact the trust was so administered, and since (assuming the trust to be valid for reasons other than those expressed by the majority) those who could complain of this equality of distribution by branch, are nevertheless content with such interpretation.
Essentially, I can live with the result because I believe the conceptual difficulties in holding this trust to be valid are based on prior jurisprudence which probably should *886 be evaluated as erroneous, as does scholarly criticism of it. There is considerable doubt, for instance, that a "trust" is a prohibited substitution within the meaning of La.Const. Art. 4, Section 16 (1952) and Civil Code Article 1520, even prior to the 1962 clarifying amendments to these provisions (which removed all doubt). See Tucker, Substitutions, Fidei-commissa and Trusts in Louisiana Law: A Semantical Reappraisal, 24 La.L.Rev. 1 (Part I), 439 (Part II) at 475-76 (1964). See also Oppenheim, A New Trust Code for Louisiana, 39 Tul.L.Rev. 187, 192-196 (1965). Especially if construed as does the majority, the trust should be held valid under these legislative authorizations, despite past erroneous judicial interpretations by which they might be characterized as substitutions.
I am also influenced to this result by an additional circumstance. The 1956 trust existed and was administered without complaint until 1968. Its validity was never questioned by those who benefit from its possible invalidity, nor by those who receive benefits under it. If created in 1968, and even if interpreted in accord with what I initially believed the less ambiguous meaning, the trust would in my opinion be valid under the 1962 amendments to the state constitution of 1921 and to the Civil Code, as well as under the 1964 Trust Code.
Without necessarily questioning the majority's assumption that the 1956 trust law governs the present trust's validity, I think that, under the circumstances, it would be an exercise in antiquarian technicality, founded on incorrect judicial interpretations, to invalidate the trust, upon this belated attack. To do so would be to allow property to vest in persons (such as the deceased wife's collaterals) completely unforeseeable and unintended as beneficiaries. Such persons, it seems to me, have no vested interest in unfortunate interpretations of the prior trust estates act, which have been repudiated by constitutional amendment and subsequent legislation.
For these reasons, although recognizing the intellectual difficulties in so doing, I respectfully concur.
NOTES
[1] See Pascal: "Civil Code and Related Legislation," 23 La.L.R. 41, 49 (1962-1963), in which Dr. Robert A. Pascal ably evaluated the effect of the 1962 Act as follows: "Act 74 of 1962 amended R.S. 9:1794 to clarify the law on the measure of the life of a trust. Before the amendment, R.S. 9:1794 provided that a trust must end, inter alia, at `the death of the [natural person] beneficiary.' This wording left much to interpretation. Some persons believed each trust was partitionable and had to end as to each beneficiary on his death * * *. Others were of the opinion a trust could continue in existence as long as any beneficiary, of either principal or income, remained alive. Still others, perhaps those in the majority, thought the trust might continue until the death of the last surviving income beneficiary, but not thereafter. The amendment fixes this last view as the law * * *."
[2] Article 1520 C.C. was amended by Act 45 of 1962.
[3] Article IV, Section 16 of the Constitution was amended by Act 548 of 1958 and Act 521 of 1962. The 1958 changes dealt with rights of adoptive children, not pertinent here. The implementing Act under the 1962 amendment is Act 44 of 1962, commonly known as the Trust Code.
[4] 250 La. 177, 195 So.2d 114 (1966), certiorari denied 389 U.S. 850, 88 S.Ct. 47, 19 L.Ed.2d 120, rehearing denied 389 U.S. 864, 88 S.Ct. 320, 19 L.Ed.2d 380.
[5] At the time of the settlor's death in 1965, the law applicable to the trust was contained in Section 16 of Article IV of the Constitution as amended in 1962, and Article 1520 of the Civil Code, as amended in 1962, and the Louisiana Trust Code of 1964.